UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| Dinsmore & Shohl LLP, | : | Case No. 1:14-cv-900 |
| | : | |
| Plaintiff, | : | |
| | : | |
| vs. | : | |
| | : | |
| Sean K. Gray and Ronda M. Stark, | : | |
| | : | |
| Defendants. | : | |

**ORDER**

Before the Court are Plaintiff's motion for summary judgment on Defendants' counterclaim (Doc. 62), and Defendants' motion for partial summary judgment on Plaintiff's complaint. (Doc. 67) Both motions are fully briefed. For the following reasons, the Court will grant Plaintiff's motion and deny Defendants' motion.

Factual Background

Dinsmore & Shohl, an Ohio law firm ("Dinsmore"), filed its complaint in this case seeking to recover legal fees from Defendants, its former clients Ronda Stark and Sean Gray (Ronda's son), who are jointly referred to as "Clients." Ronda Stark is a lawyer by training; Sean Gray was an adult at the time of the events giving rise to this case. Dinsmore represented Clients in litigation in the Hamilton County Probate Court that related to the estate of Ms. Stark's mother, Charlotte Stark. Ronda Stark first contacted Dinsmore in September 2012, after two wills executed by Charlotte Stark had been filed in the probate court (one dated in August 2007 and one dated in February 2011). Broadly summarized, Ronda Stark believed that her brother, Frank Stark, had unduly and unlawfully influenced their mother to change her estate plan to benefit Frank, and to

Ronda's detriment, and she wanted to challenge the validity of the 2011 will.

Dinsmore entered into a written hourly fee agreement with Clients on September 10, 2012.  That letter agreement stated that after Dinsmore had completed its initial investigation, the Clients and Dinsmore "shall discuss the viability of a contingent fee billing arrangement, whereby [Dinsmore] would receive 33% of any inheritance (including both probate and non-probate assets) afforded before any trial, and 40% as a consequence of trial."  (Doc. 68-1 at PAGEID 1602) Under the terms of the initial hourly fee agreement, Dinsmore was to bill Clients monthly for services rendered, and Clients paid a $5,000 retainer.

Sometime in the winter of 2013, Tom Bonasera (one of the counterdefendants) became the official billing partner on Clients' account.  A past due balance had accrued on the account by late February.  Bonasera contacted Ronda Stark, and they discussed the option of a contingent fee arrangement.  Bonasera and Ms. Stark exchanged emails on March 1, 2013, in which Ms. Stark expressed concern about the security of her mailbox, stating that she had not previously seen the fee bills and time records that Bonasera apparently sent to her around that date.  She asked him for an estimate on litigation costs; Bonasera responded with an estimate, and asked her to review the bills. He also asked her to please bring her balance current "right away and/or choose to go on contingent."  (Doc. 68-3 at PAGEID 1606)   Dinsmore and Clients executed a contingent fee agreement on April 26, 2013 that included the 33%/40% contingent fee arangement mentioned in the initial hourly agreement.  Suffice to say that the parties dispute most of the specific facts and circumstances that preceded the execution of this agreement.

The will contest action was filed on October 2, 2012 with Sean Gray as the sole plaintiff. Charlotte Stark's 2007 will bequeathed her equity securities to Ronda Stark, and divided her fixed-income assets equally among Ronda, Frank, and Sean Gray. Subsequent codicils to that will gave her real estate equally to Frank and Ronda, and replaced Ronda with Frank as executor. Charlotte Stark's 2011 will, the subject of the will contest action, contained a no-contest clause; Ronda Stark was a named beneficiary in that will while Mr. Gray was not. (Doc. 68-7 at PAGEID 1639) The 2011 will also provided that Charlotte Stark's stocks and bonds that were "not covered by the Transfer on Death at Ross Sinclaire" would be equally divided between Ronda and Frank Stark. Charlotte Stark had maintained a brokerage account at Ross Sinclaire & Associates for many years; her broker was Carl Kalnow. Discovery in the probate litigation revealed that Charlotte Stark executed a transfer on death authorization for that account in August 2009, naming Frank Stark as the transferee on her death. After that TOD authorization, equities and bonds that Charlotte Stark kept in a safe deposit box were transferred into the RSA account. These transfers were a major focus of Ronda Stark's claims asserted in the probate litigation.

Robert Zimmerman (one of the Dinsmore attorneys named in Clients' counterclaim) states in an affidavit that he talked with Ronda Stark on April 16, 2013 and told her that Dinsmore represented RSA. Zimmerman's email to Ms. Stark on that day states that RSA had been a Dinsmore client for a least a couple of years, and that the firm had active matters open for RSA. Zimmerman told Stark to let Dinsmore know "how you wish to proceed." (Doc. 47-1, Zimmerman Affidavit at ¶4 and Ex. 1) These discussions took place before the Kalnow deposition on May 20, 2013, and Zimmerman

provided Ms. Stark a summary of his testimony the same day. Stark (who lives in Seattle) contacted a Seattle securities attorney, Christopher Wells, on May 21 and eventually entered into an attorney-client relationship with Mr. Wells.

Zimmerman further avers that he and Ms. Stark later discussed retaining a securities expert to review the RSA transactions, and whether such an expert would be helpful to Clients' position in the probate litigation. Zimmerman told his Dinsmore colleagues in an email that he had expressed doubts to Ms. Stark about the potential value of such an expert opinion; Ms. Stark responded by implying "... that Dinsmore was reluctant to hire [the expert] because Dinsmore also represented RSA. I informed Ms. Stark that this was not the case and reiterated the strategic considerations that I had previously expressed to her. ... I specifically told her that if she was uncomfortable with our handling of the [probate litigation] or the Ross Sinclaire Associates issue, she should terminate her relationship with Dinsmore and secure new counsel. I specifically informed Ms. Stark that 'you're the boss' and that we would not stand in her way if she wanted to obtain separate counsel." (Doc. 47-1 at ¶¶11-12) Dinsmore was unaware of Ms. Stark's relationship with Seattle attorney Wells until mid-November 2013, when Wells attended the mediation session and a pre-mediation meeting with Clients and Dinsmore attorney Bonasera.

In the summer of 2013, after additional discovery had been undertaken in the probate case, Dinsmore filed a complaint against Frank Stark for fraudulently concealing and transferring assets of Charlotte Stark's estate. The probate court eventually consolidated the fraudulent concealment case with the will contest and the Clients' objections and exceptions filed in the estate administration case, as reflected in

-4-

a September 20, 2013 order.[1]  (An additional related lawsuit was pending in the common pleas court, an interpleader action filed by U.S. Bank concerning an account or accounts in which Frank Stark asserted an interest, which sought a determination of the proper ownership of those assets.)  The court set a bench trial date of December 5, 2013 for the consolidated cases.

In October 2013, the Stark estate and Frank Stark (both as executor and individually) filed a motion for summary judgment on all claims and on Clients' inventory exceptions.  (Doc. 73-1) The probate court denied the bulk of that motion in a November 7 entry (Doc. 73-4), and the parties thereafter held a mediation session on November 18.  No resolution was reached, but the parties apparently continued to discuss a potential settlement while preparing for trial.  In the days before the trial date, counsel for the estate and Dinsmore engaged in a series of written and oral communications that culminated in agreed material terms of a settlement.  Late on December 4, counsel notified the probate court that they would appear the next day to confirm the settlement and that a trial would not be necessary.  Clients do not dispute  that they were present in Cincinnati at Dinsmore's office on December 4 and were involved in the series of communications that led to the December 5 hearing.

That morning, all counsel and all parties appeared before Judge Cissell.  The transcript of that hearing (Doc. 63-1) reflects that Dinsmore attorney Vanderlaan confirmed that a settlement had been agreed to, and asked the Court for about two

_____

[1] This entry can be found on the Hamilton County, Ohio Probate Court website, Case no. 2013001538.  See https://www.probatect.org/court-records-search, last accessed March 28, 2016.

weeks to prepare the written agreement "because there's some fairly careful tax considerations that are important for all of us. ... [T]he financial terms have been agreed to and release terms and the like ... . [T]here is an agreement and that we thought it appropriate to just simply state that for the record so that your honor knows and can schedule it for that finality on the agreement [sic]." (Id. at PAGEID 798) Counsel for the estate (Mr. Frooman) told the court that the parties worked hard to settle all of the disputed issues, and Mr. Vanderlaan noted that the settlement included a protocol to address the division of Charlotte Stark's personal property. Mr. Frooman informed the court that the "... clients are here and - they're aware of the terms of the settlement absent them vetoing that now I assume they are in agreement with the settlement that's been represented to the Court and as it was explained to them by counsel." (Doc. 63-1 at PAGEID 800) No one took exception to anything said by counsel or by the court during this hearing. Over the next two weeks, counsel exchanged drafts of a written settlement agreement, and negotiated the details concerning handling taxes, the personal property, gain/loss on equities, and other ancillary issues.

However, within a very short time Ronda Stark was objecting to the settlement terms. Dinsmore wrote a letter to her and Sean on December 26, 2013 (Doc. 47-1 at PAGEID 386-391) that summarized counsels' understanding of the history of the case and the negotiations leading up to the December 4 agreement on terms and the December 5 court hearing. Dinsmore asked Ronda Stark for specific authorization to conclude the settlement on the terms set forth in the letter, but she refused to do so. Instead, on January 9, 2014, she filed a written "status report" with the probate court. (Doc. 47-1 at PAGEID 398-406) She claimed in this report that her relationship with

Dinsmore had deteriorated "as a result of their failure to disclose the true nature of their representation of Ross, Sinclaire and Associates until a few weeks before trial. Dinsmore's undisclosed conflicts of interest in this case were not, in my opinion, handled in an appropriate manner, to the detriment of my son ... and myself." Ms. Stark asserted that the deterioration left her with "no choice" but to effectuate a settlement. She accused Dinsmore of "requiring" her to execute the contingent fee agreement without informing her of its alleged conflict of interest, and claimed that Dinsmore "insisted" that she replace the hourly fee contract with the contingent fee agreement. She accused Dinsmore of ignoring her conviction that Frank Stark colluded with Carl Kalnow in arranging for all of Charlotte's equities and bonds to be improperly transferred to the RSA account, and was concerned that Dinsmore's deposition cross-examination of Kalnow was somehow deficient. She told the court that she contacted attorney Wells after Dinsmore refused to take the deposition of Adele Rossow (another Ross Sinclaire employee), as she was considering having Wells seek pro hac vice admission to handle the trial examination of Carl Kalnow.

She also alleged that she and Sean Gray uncovered additional securities held by Charlotte Stark that were not held in the RSA account, and claimed an entitlement to these shares because she found them when others had not. She informed the court that Dinsmore exerted "enormous pressure" on her on December 3 and 4 to settle on terms she did not accept. She asserted that when she arrived at the courthouse on December 5, she told Vanderlaan that she intended to "object on the record. It was clear, however, that if I did object, it would result in representation that was severely compromised. To the extent settlement was entered on the record, it was a forced

settlement in all respects."  (Doc. 47-1 at PAGEID 404)

Probate Judge James Cissell held a hearing on January 13, 2014 (which apparently had been set in order to confirm the final settlement agreement).  Ronda Stark appeared at the hearing, and told the court that Vanderlaan had told her that she either had to appear in person or authorize Dinsmore to conclude the settlement.  Judge Cissell noted that her status report included "some pretty serious allegations raised about conflict.  I'm not sure what the consequences of all that are, one way or another." (Doc. 63-2 at PAGEID 809)   Outside counsel for Dinsmore (Mr. Greer) asked the court for more time so that he could discuss the situation with Mr. Wells (Ronda Stark's Seattle lawyer) or with another lawyer of her choosing.  He also asked the court to set a hearing on a motion to enforce the settlement.  Judge Cissell questioned whether the probate court could exercise jurisdiction over such a motion, and whether there was a settlement agreement ready.  Mr. Frooman stated that a final agreement was prepared, but it was clear that Ms. Stark was refusing to sign it.  If the parties could not resolve the dispute, Frooman said that the estate would file a motion to enforce the settlement that would also address any concern about jurisdiction.  (Id. at PAGEID 818)

Negotiations apparently continued over the next two months, during which time Frank Stark resigned as the estate's executor, and the probate court appointed an independent administrator, attorney Theodore Riker.  On April 7, the probate court entered an order following a hearing at which Ms. Stark and Mr. Wells appeared by telephone.  The court ordered that the estate's motion to enforce settlement must be filed by April 29, 2014, responses filed by May 13, and set an evidentiary hearing for May 15, 2014 at 1:00 p.m.  The court also set a trial date of June 30, 2014, and ordered

Ms. Stark and Sean Gray to obtain new local counsel (as they stated they intended to do) no later than April 29. On that date, the administrator Mr. Riker filed the motion to enforce the settlement that had been reached on December 4, 2013.[2] Ms. Stark filed an opposition to the motion and a motion seeking to bar testimony from Dinsmore lawyers (who had been subpoenaed by the estate) at the May 15 evidentiary hearing. (Doc. 82-2) Dinsmore also filed a motion for leave to withdraw as counsel for Ms. Stark and Sean Gray.

At the May 15 hearing, Ms. Stark and Mr. Wells appeared by telephone. (See Doc. 63-3, transcript of 5/15/2014 probate hearing.) Sean Gray did not appear, but Ms. Stark informed the court that she had his power of attorney. The court expressed great dissatisfaction with his failure to appear, noting that he was the sole plaintiff in the will contest action. Ms. Stark also told the court that she had not retained local counsel. The court asked her if she was discharging Dinsmore, and she responded that it was difficult to answer the court's question, but that she would "allow them to withdraw." (Id. at PAGEID 838) The court observed that both Ms. Stark and Mr. Gray were present in court on December 5 when counsel announced that a settlement had been reached, and that neither Ms. Stark nor Mr. Gray raised any objection or voiced any concern to the court. When the court asked Ms. Stark if that was in fact the situation that occurred, she claimed that she could not hear what was being said on December 5. (Id. at PAGEID 844)

The court then turned to the settlement, and repeatedly questioned Ms. Stark

---

[2] See probate court docket in Consolidated Case No. 2012001538, https://www.probatect.org/court-records-search, last accessed March 28, 2016.

what she believed she could achieve by rejecting the settlement and proceeding to a

trial. The court asked her if she understood "... the considerable liability position you

could be placing yourself in versus where you could be otherwise?" (Doc. 63-3 at

PAGEID 866-867) After further discussion, the court repeated the question: what did

she expect to gain from a trial that would be greater than what she would get by

confirming the settlement. She responded that her "goal" would be to reinstate the

2007 will but conceded that she understood her chances of doing so were very slight.

(Id. at 869) The court again asked her what greater monetary benefit would she expect

to receive after trial than what the estate was willing to give up via the settlement; she

could not answer the court's question. (Id. at PAGEID 871-872) The court recessed

the hearing for approximately half an hour, to allow Ms. Stark and Mr. Wells to discuss

modifying the settlement with the administrator. After the recess, Mr. Riker informed the

court that he did not have the authority to renegotiate the settlement agreement in the

manner requested by Ms. Stark, and that it was in the best interests of everyone to

proceed with the hearing on his motion. (Id. at 877)

The estate presented testimony from Mr. Riker, who described his appointment

by the court, his review of the case, his discussions with counsel for the parties

(including Mr. Wells), and the legal research he conducted. Mr. Riker concluded that an

enforceable settlement existed and instructed Mr. Frooman to file the motion for the

estate. The court denied Ms. Stark's motion to bar testimony from the Dinsmore

attorneys, and the estate called Robert Zimmerman to testify. Zimmerman described

Dinsmore's involvement in the case, the discovery undertaken, and the negotiations that

led to the settlement. When the court asked if testimony about "the details of all of the

litigation" was necessary, Mr. Frooman responded that it was, in order to counter Ms. Stark's allegations that Dinsmore failed to properly advise her, had misinformed her or "pressured" her to settle, or that some fraud had been perpetrated by Dinsmore, by the executor or even by Mr. Frooman's law firm.  (Id. at PAGEID 907-908)

Zimmerman also testified about the specific negotiations over settlement terms that occurred on December 3 and 4, including the emails that were exchanged between counsel for the parties.  The court allowed Ms. Stark to cross-examine Mr. Zimmerman, and she asked questions about the estate tax return and some provisions of the settlement agreement.  Mr. Vanderlaan then testified, stating that the material settlement terms were set forth in the email exchanges between counsel.  He also testified that Ms. Stark and Sean Gray were present at Dinsmore all day on December 4, and actively participated in the discussions leading to a resolution, and agreed to the material terms of the settlement.  Ms. Stark presented no other witnesses to support her accusations and allegations made against Dinsmore in her January 9 status report.

At the end of the testimony, the court stated that it had been initially concerned about how the estate might be able to prove "... that in fact there was a settlement agreed with sufficient specificity as to the terms to be able to be successful on a Motion to Enforce Settlement.  Having spent a fair amount of time this past week and having heard the testimony here today, I am going to reverse my initial thoughts and I am going to find that in fact there is sufficient evidence to hold that the Motion to Enforce Settlement is well taken."  (Doc. 63-3 at PAGEID 988)  The court summarized the evidence and the cases he relied on to reach that conclusion.  Mr. Frooman stated that he would draft an entry reflecting the court's decision and send it to Ms. Stark and Mr.

Wells for comment.  Mr. Wells specifically requested that the Entry include the court's certification of the order as a final appealable order under Ohio Civil Rule 54(b), and the court agreed to do so.  (Id. at PAGEID 991-992)

The written entry was filed on June 5, 2014.  (Doc. 63-4) The court formally denied Ms. Stark's motion to bar testimony from the Dinsmore attorneys, finding that if any privileged information had been disclosed at the hearing, any applicable privilege had been waived by her allegations of Dinsmore's wrongdoing that she voluntarily revealed in her January 9, 2014 status report.  The court granted the Administrator's motion to enforce the settlement, reviewing applicable Ohio law with respect to settlement agreements and their enforceability.  The court cited the transcripts of the December 5, 2013 and May 15, 2014 hearings, and concluded:

> .. the Dinsmore & Shohl attorneys conducted extensive discovery and were intimately familiar with the facts and issues in the consolidated litigation.  They exercised their own independent analysis and judgment in negotiating the settlement on behalf of Ronda M. Stark and Sean K. Gray. ... There is no evidence that Ronda M. Stark or Sean K. Gray were fraudulently induced to enter into the settlement agreement.  There is no evidence that Ronda M. Stark or Sean K. Gray were pressured in any way to enter into the settlement agreement.  There is no evidence that Ronda M. Stark or Sean K. Gray failed to understand any of the terms of the settlement agreement.

(Doc. 63-4 at PAGEID 1002,1003)  The court retained all jurisdiction necessary to enforce the settlement, and held that "Pursuant to Ohio Civil Rule 54(B), this is a final appealable order, and there is no just cause for delay."  (Id. at PAGEID 1005)

Neither Ronda Stark nor Sean Gray appealed this order.  The administration of the estate continued, and other disputes and objections were addressed by the court in a January 16, 2015 entry.  (See Doc. 63-5)   After reciting the history of the case leading

up to the order enforcing the settlement, the probate court noted that after that order

was filed, Clients (now represented in the probate case by attorney McMahon) filed

exceptions to the administrator's account.  The court described the exceptions and

related filings as

> ... an expedition based upon concerns and suspicions that Frank Stark
> somehow or another has estate assets that are still subject to discovery
> and litigation notwithstanding the settlement agreement. ... Ronda Stark
> currently is not prepared to offer proof on these matters other than a
> fishing expedition and as such apparently would not have been able to
> prove anything in this area at the trial which was scheduled to proceed on
> December 5, 2013. ... The exceptions to the account deal almost entirely
> with issues that were raised or could have been raised in the consolidated
> litigation.  The settlement was intended to end the controversy between
> the parties. ... The Court finds that these exceptions are a thinly veiled
> attempt to re-litigate the issues that Ronda Stark and Sean Gray already
> resolved and dismissed with prejudice.

(Doc. 63-5 at ¶¶29-31, PAGEID 1017)  In addressing a particular objection concerning a

certificate of deposit held at US Bank, the court noted that the CD had been clearly

identified in discovery long before the settlement, that the parties had stipulated to the

authenticitiy of US Bank documents regarding the CD, and it had been marked as a

deposition exhibit as early as March 2013.  The court held: "Ronda Stark and Sean

Gray's decision not to focus their attention on that account at that time does not mean

they can re-litigate the issues now."  (Id. at PAGEID 1018)  In the same entry, the court

granted Clients' motion for a partial distribution from the estate.

After Clients refused to pay fees to Dinsmore, the probate court ordered the

estate to withhold 35% of future distributions to the Clients until the dispute was

resolved. Dinsmore then filed a complaint against Clients on September 25, 2014 in

Ohio common pleas court.  Clients removed the case on the basis of diversity

jurisdiction, and filed an answer and a legal malpractice counterclaim against the three
Dinsmore attorneys who primarily represented them in the probate litigation. Clients
principally allege that the Dinsmore attorneys were burdened with a material conflict of
interest and therefore failed to pursue the potential liability of Ross Sinclaire &
Associates. Clients allege that RSA, particularly Carl Kalnow and/or his assistant Ms.
Rossow, aided and abetted or improperly facilitated Frank Stark's allegedly improper
and fraudulent transfer of Charlotte Stark's securities from her safe deposit box to RSA
while Charlotte was incapacitated. Dinsmore represented RSA in unrelated matters,
and Clients allege that Dinsmore favored RSA's interests by informing Clients that they
had no viable legal claim against RSA. They allege that the conflict interfered with
Dinsmore's deposition examination of Carl Kalnow, and resulted in Dinsmore's refusal
to depose Ms. Rossow. They also allege that the Dinsmore attorneys "forced" them to
settle because Dinsmore was more interested in recouping its contingent fees than in
aggressively pursuing Clients' claims against RSA and/or Frank Stark.

In an affidavit, Ronda Stark asserts by the eve of the scheduled probate trial, it
was clear to her that Dinsmore's conflict of interest would prevent Dinsmore from
properly cross-examining RSA personnel at trial. She alleges that Dinsmore had
refused to amend her complaint against Frank to allege a claim of intentional
interference with inheritance expectancy, so she and her son "knew we could not win
the trial starting the following day." (Doc. 80-1 at ¶46) She further avers that on
December 5, she told Dinsmore attorney VanderLaan that she disagreed that a
settlement had been reached, and she intended to raise her objections to the probate
judge. However, "... I realized I could not go through with my intended action because,

-14-

if I did so, the Court would merely begin the trial that morning and we could not go to

trial with Attorneys who were conflicted and who were not prepared to win the case at

trial."  She said nothing to the probate court and did not object when the attorneys

announced the settlement.  (Id. at ¶47)

## ANALYSIS

Summary Judgment Standards

The court "shall grant summary judgment if the movant shows that there is no

genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(a).  An assertion of an undisputed fact must be

supported by citations to particular parts of the record, including depositions, affidavits,

admissions, and interrogatory answers.  The party opposing a properly supported

summary judgment motion "'may not rest upon the mere allegations or denials of his

pleading, but ... must set forth specific facts showing that there is a genuine issue for

trial.'"  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) (internal quotation

omitted).

The party bringing the summary judgment motion has the initial burden of

informing the district court of the basis for its motion and identifying portions of the

record that demonstrate the absence of a genuine dispute over material facts.  Mt.

Lebanon Personal Care Home, Inc. v. Hoover Universal, Inc., 276 F.3d 845, 848 (6th

Cir. 2002).  Once that occurs, the party opposing the motion then may not "rely on the

hope that the trier of fact will disbelieve the movant's denial of a disputed fact" but must

make an affirmative showing with proper evidence in order to defeat the motion.  Street

v. J.C. Bradford & Co., 886 F.2d 1472, 1479 (6th Cir. 1989).

The burden is on the non-moving party to "present affirmative evidence to defeat a properly supported motion for summary judgment...," Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479-80 (6th Cir. 1989), and to designate specific facts in dispute. Anderson, 477 U.S. at 250.  The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts."  Matsushita Electric Industries Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  The court must assess "whether there is the need for trial — whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party."  Id. at 250.  "If the evidence is merely colorable, ...  or is not significantly probative, ... the court may grant judgment." Anderson, 477 U.S. at 249-50 (citations omitted).

The court construes the evidence presented in the light most favorable to the non-movant and draws all justifiable inferences in the non-movant's favor.  United States v. Diebold Inc., 369 U.S. 654, 655 (1962).

Dinsmore's Motion for Summary Judgment

Under Ohio law, a claim for legal malpractice based on an attorney's negligence requires a plaintiff to establish the following elements:

(1) that the attorney owed a duty or obligation to the plaintiff, (2) that there was a breach of that duty or obligation and that the attorney failed to conform to the standard required by law, and (3) that there is a causal connection between the conduct complained of and the resulting damage or loss.

Environmental Network Corp. v. Goodman Weiss Miller, LLP, 2008 Ohio 3833, at ¶13

-16-

(Ohio 2008).  Clients' essential allegation is that Dinsmore breached its duties to them because the Dinsmore attorneys labored under a material conflict of interest during their representation of Clients in the underlying probate litigation.  They allege that Dinsmore's breach resulted in the enforcement against them of an unfavorable settlement, and deprived them of a trial on the merits of their claims.

Dinsmore raises several grounds on which it seeks summary judgment.  First, Dinsmore contends that Clients' counterclaim is barred by the doctrine of issue preclusion.  As stated by the Ohio Supreme Court, issue preclusion (or collateral estoppel) "precludes the re-litigation, in a second action, of an issue that had been actually and necessarily litigated and determined in a prior action that was based on a different cause of action."  State ex rel Nickoli v. Erie MetroParks, 124 Ohio St.3d 449, 453 (Ohio 2010).  "A valid, final judgment rendered upon the merits bars all subsequent actions based upon any claim arising out of the transaction or occurrence that was the subject matter of the previous action."  Grava v. Parkman Township, 73 Ohio St.3d 379 (1995), syllabus. In that case, the Supreme Court overruled its earlier decisions limiting the application of collateral estoppel to causes of action that are identical to those previously litigated and decided.  The court noted that more recent jurisprudence and case law holds that a final judgment is conclusive "as to all claims which were **or might have been** litigated in a first lawsuit."  Id. at 382 (emphasis in original, internal citations omitted).  It cited the Restatement of Judgments, Section 24(1), which provides that when a final judgment "... extinguishes the plaintiff's claim pursuant to the rules of merger or bar ..., the claim extinguished includes all rights of the plaintiff to remedies

against the defendant with respect to all or any part of the transaction, or series of

connected transactions, out of which the action arose."  The term "transaction" is

defined as a "common nucleus of operative facts."  Issue preclusion thus applies even

though a plaintiff may plead different causes of action or pursue different legal theories

of relief, so long as the common operative facts were at issue and decided in the prior

action.

        In Grava, the Supreme Court affirmed the dismissal of plaintiff's appeal of a local

zoning board's denial of a zoning certificate.  Plaintiff had previously applied to the

board for a permit, which was based on one section of the zoning ordinance and which

had  been denied.  The plaintiff did not appeal that decision.  Even though his second

application involved a different question of law and a different claim under the

ordinance, the application sought to construct the same building on the same piece of

property.  Since the "operative facts" were the same, his appeal was dismissed.

        Here, Dinsmore argues that the probate court's entry enforcing the settlement

operates to bar any claim that Clients would have obtained a more favorable result at

trial if Dinsmore's representation had been conflict-free and allegedly untainted by

Dinsmore's breach of duty.  Clients were present in Dinsmore's office when the material

terms of the settlement were discussed and agreed to, and they appeared before the

Court on December 5 when counsel confirmed the fact of the settlement to the probate

court.  Neither of them objected or expressed any concern or lack of understanding

about any term of the settlement, even when counsel expressly noted that all of the

parties were present in court to confirm that they had settled the cases.  Yet a month

later, Ms. Stark filed her "status report" and asserted that Dinsmore "coerced" her into

an unfavorable settlement due to Dinsmore's alleged conflict of interest that they had

not disclosed or adequately explained to her.  After several conferences and the May

14, 2014 evidentiary hearing, Judge Cissell found that a valid and enforceable

settlement had been reached.  But more specifically, as noted above, Judge Cissell

held that Clients had failed to adduce any evidence that either of them were fraudulently

induced to settle, that they were pressured in any way to settle, or that either of them

failed to understand any of the terms of the settlement agreement.  The nucleus of

operative facts at issue in the evidentiary hearing and the entry enforcing the probate

settlement were the factual allegations in Ms. Stark's status report: that Dinsmore's

improper conduct or conflict of interest resulted in a settlement that was far less

favorable to Clients than if they had proceeded to trial.  That nucleus of operative facts

is precisely what Clients allege in this case, and must prove in order to succeed on their

counterclaim against Dinsmore.

Moreover, there is no question but that the probate court's order was final and

appealable.  Clients specifically requested the probate court to include language under

Ohio Civil Rule 54(B) that would permit them to appeal the order enforcing the

settlement.  They did not appeal that order and it is final.  Indeed, as Dinsmore notes,

Clients subsequently sought to enforce terms of the settlement against Frank Stark in

later probate court filings.

Clients respond by arguing that the probate court is a court of limited jurisdiction

and could not have determined the merits of Clients' legal malpractice claim against

Dinsmore.  But as is clear from the cases discussed above, the label of the claim being

asserted does not control the application of issue preclusion: the question is whether

-19-

the common operative facts were at issue and decided in a prior final judgment.  Clients

had ample opportunity to present evidence to the probate court to substantiate Ms.

Stark's allegations of coercion, of being misinformed, or being misled by anything

Dinsmore did or failed to do regarding the settlement of the probate litigation.  Ms.

Stark's opposition consisted largely of disputing the terms and suggesting that they

were incomplete or overlooked items she alleged should not have been overlooked.

The Court concludes that the facts common to Clients' objections to the probate

settlement and their counterclaim in this case - that Dinsmore's alleged malpractice and

breach of duty pressured them, coerced them, and/or fraudulently induced them to

settle for less - were decided against them in the probate litigation.  Their counterclaim

is therefore barred by issue preclusion.

Dinsmore's second argument, related to the first, is that even if issue preclusion

does not apply, Clients have offered no evidence establishing a genuine factual dispute

that they **would** have obtained a greater recovery if they had proceeded to a trial in the

probate cases.  Dinsmore cites Environmental Network Corp. v. Goodman Weiss Miller,

LLP, 119 Ohio St.3d 209, 2008 Ohio 3833 (Ohio 2008), where the Ohio Supreme Court

reviewed a malpractice verdict against a law firm that had represented plaintiffs in a

case that had been settled on the second day of trial.  Plaintiffs sued the firm a year

after the settlement, alleging that the lawyers' malpractice coerced them to settle.  The

law firm appealed the trial court's denial of its motion for judgment notwithstanding the

verdict, arguing that the plaintiffs failed to prove that the alleged malpractice caused

them any damages.  The Supreme Court agreed, noting that the plaintiffs had the

burden of proof on the "case within the case" involved in the malpractice claim.  While

plaintiffs had evidence supporting their underlying claims, they lacked "any evidence as to whether [they] would have had a better outcome had the matter gone to trial.  This is the sole theory [plaintiffs] advanced in the legal malpractice action, but the evidence is insufficient to support their claim because [plaintiffs] had to establish that they actually would have won their case and that any award for their losses would not have been offset by the competing claims against them."  Id. at 214.

Clients have proffered expert opinions of Jonathan Coughlan, Lawrence Fox, and Geoffrey Stern, who each opine about Dinsmore's alleged breach of duty and the firm's conflict of interest that Ms. Stark raised to the probate court in January 2014.  Dinsmore contends that regardless of these opinions, none of the experts articulate an opinion that Clients' result from a trial in the probate court would have been better than the settlement that was reached and enforced by that court.  For instance, Coughlan opines that Dinsmore's conflict of interest and breaches of duty "effectively denied" Clients an "opportunity" to obtain "a judgment in the amount Dinsmore had projected was the likely recovery if successful at trial."  (See Doc. 51-6 at PAGEID 564)  Fox states that after his own review of the record, Kalnow's actions "should have provided the clients the foundation for a meritorious claim against RSA."  (Doc. 51-1 at 9, PAGEID 498)  He also opines that Dinsmore's various defalcations "forced" Clients to settle on "terms that could have been dramatically improved, if their own lawyers had not removed key arrows from the clients' quiver."  (Doc. 51-1 at 16, PAGEID 505)  In order to satisfy Clients' burden of showing that Dinsmore's breaches of duty caused them harm by depriving them of a better outcome, their experts must do more than identify an "opportunity," or speculate about what might have resulted from a trial in the

probate court.

Clients' malpractice and breach of duty allegations place the merits of the underlying probate cases directly at issue. Environmental Network and cases decided thereafter make it clear that plaintiffs prosecuting legal malpractice claims based on their lawyers' conduct in the "case-within-the-case" must satisfy the causal connection prong with evidence that they would have recovered more, or would have benefitted in some tangible, measurable manner, absent the attorney's breach.

In Hall v. Gilbert, 2014 Ohio 4687 (8th Dist. App. 2014), the court of appeals affirmed a summary judgment granted to a lawyer because plaintiff failed to connect his alleged damages to any breach of the lawyer's duty. Hall alleged that his lawyer failed to properly explain the legal effect of a stipulation he agreed to file in his former employer's bankruptcy proceeding (which had stayed his personal injury case against the employer). He also alleged that his attorney failed to obtain his informed consent to that stipulation. The stipulation allowed the bankruptcy stay to be lifted so that the employer's appeal from a verdict against it in the plaintiff's lawsuit could be decided. In exchange, the stipulation limited the plaintiff's recovery to the amount of the supersedeas appeal bond that had been posted by the employer (covering the judgment and attorney's fees). After that stipulation was entered, the judgment against the employer was vacated and the jury's original verdict (which was much larger than the judgment) was reinstated. The Ohio court of appeals concluded that the plaintiff had not established that he would have had a better outcome than he obtained from the stipulation; there were major uncertainties about the length of time the employer's bankruptcy would continue. And even if he waited, he would have been one of many

unsecured creditors, with any eventual recovery greatly diminished by that status.

Plaintiff's speculation that he would have been better off without the stipulation was not

sufficient to overcome the lawyer's summary judgment motion.

In Davis v. Brouse McDowell, LPA, 596 F.3d 1355 (Fed. Cir. 2010), the plaintiff

brought a malpractice claim against patent attorneys, alleging that their breaches of

duty (including missed filing dates, and poorly drafted patent specifications and claims)

caused the denial of her patent applications. The Federal Circuit, applying Ohio

malpractice law, affirmed summary judgment granted to the lawyers because plaintiff

failed to produce any evidence showing that she would have received patents in the

absence of the attorney's negligence. Her expert opined at length about the attorney's

deficient legal advice and negligent preparation of the patent applications; but he simply

opined that "but for" that malpractice, plaintiff would have obtained patents, that he had

seen nothing in the record that "would have blocked her ability to have secured

commercially meaningful patents on her inventions." Id. at 1363. The court held that

the expert's opinion was insufficient to create a genuine dispute that she would have

obtained patents. The expert did not analyze patentability, did not perform a prior art

search, and had not identified any particular patent claims that could be made for the

inventions. The court concluded that plaintiff failed to establish a genuine factual dispute

on the causal prong of her malpractice claims, noting that "an expert's naked conclusion

is insufficient to survive summary judgment." Id. at 1364 (internal citations omitted).

Two other cases reach similar results. In McCarty v. Pedraza, 2014 Ohio 3262

(2nd App. Dist. 2014), the court found that the plaintiff/former client failed to show that

his attorney's duty-breaching conduct in allowing a default judgment to be entered

-23-

against him was causally connected to his damages, which he alleged was the amount

of the default judgment.  The case-within-the-case doctrine applied to plaintiff's

malpractice claim, and the court held he failed to show that he would not have been

liable at all in the underlying case, or would have been liable in some lesser amount

than the amount of the default judgment.  Summary judgment for the attorney was

affirmed.  And in Waite, Schneider, Bayless & Chesley v. Davis, 2015 U.S. Dist. LEXIS

36771 (S.D. Ohio, March 24, 2015), the district court entered summary judgment for the

law firm on client's malpractice counterclaim because the client failed to show a causal

link between the attorneys' alleged malpractice and his damages.  The court cited Ohio

law stating that in "most" malpractice cases, expert testimony on proximate cause is not

required.  However, the district court found that the factual circumstances underlying the

client's malpractice claim (the case-within-the-case) were sufficiently complex that

"expert testimony is essential to keep the jury from speculating on how the client's loss

or injury is directly linked to that which he claims was the breach of duty by the

attorney."  Id. at *41 (internal quotations and citations omitted).

    In Waite Schneider, the client claimed that his attorneys' misconduct reduced the

value of an overall settlement reached in the underlying case.  The settlement included

the resolution of several related cases between client and his sons and their closely-

held corporation.  The client argued that his expert's opinion was sufficient to create a

genuine dispute on causation, as the expert opined in great detail and at great length

about the applicable standard of care, and the particular manner in which the attorneys

had breached their duty to the client.  But the district court disagreed, finding that the

expert did not "construct a causal link - let alone give the jury what it needs to deal with

a potentially massive tangle of facts and issues - to reach a sensible and fair verdict."
Id. at *44.

Here, Clients contend that they have produced "some evidence" of a causal connection between Dinsmore's alleged breaches and conflict of interest, and their damages.  And as noted by the district court in Waite Schneider, there are cases in which "some evidence" is sufficient to allow a malpractice claim to be decided by a jury. See, e.g., Montgomery v. Gooding, Huffman, Kelly & Becker, 163 F.Supp.2d 831 (N.D. Ohio 2001), where plaintiff offered lay testimony that continued litigation over a negligently drafted purchase agreement for the sale of real estate caused a reduced pace of sales of lots, which resulted in a reduced value of the real estate (and which in turn caused some of plaintiff's losses at issue).  The court held that expert testimony was not required to show a causal link, because the evidence and testimony of the developer linking the purchase agreement's ambiguity to the reduced property value was sufficient to avoid summary judgment.  But in this case, as in Waite Schneider, the Court finds that simply producing "some evidence" is not sufficient.  It is clear to this Court that the probate disputes were vigorously contested, that complex legal and factual issues were raised by Clients' will contest, their allegations against Frank Stark, their contentions about Charlotte Stark's competency and intent to change her estate plan, and their allegations in this case about Ross Sinclaire. Their experts have opined at length about Dinsmore's breaches of duty and the alleged conflict of interest, but have not shown how or why those alleged breaches caused Clients any harm by the enforcement of the settlement.  The Court has reviewed Clients' expert reports and finds they are deficient in establishing a jury issue on the essential question of whether

Clients would have obtained more by going to trial with non-conflicted attorneys in the probate court than what they got via the settlement.  This is true whether the specific issue is the merits of their contentions regarding Frank Stark, or Charlotte Stark's capacity to execute the 2011 will, or Dinsmore's alleged conflict of interest in its representation of Ross Sinclaire.  In the absence of evidence raising a genuine dispute on this issue, Dinsmore is entitled to judgment because Clients have not established the third prong of their malpractice claim, that there is a causal link between Dinsmore's breaches and their alleged losses.

Clients' counterclaim also alleges that Dinsmore failed to adequately prepare for the probate trial, failed to engage in adequate discovery from Ross Sinclaire, and/or failed to properly advise them about Ross Sinclaire's potential liability to them, all due to Dinsmore's alleged material conflict of interest.  Dinsmore seeks judgment on these allegations.  It argues that Clients have identified no material disputed fact concerning the legal viability of a claim against Ross Sinclaire.  None of their experts opine that such a claim existed, much less a claim that might have been successfully pursued.  In their response, Clients do not present any substantive argument on the issue of Ross Sinclaire, nor contest Dinsmore's citations to the testimony of Andrew Warning, Ross Sinclaire's Chief Compliance Officer, who testified that RSA had no duty or legal obligation to investigate Charlotte Stark's execution of the Transfer on Death authorization for her RSA account.  Nor do Clients raise a genuine factual dispute about Dinsmore's assertion that its attorneys were fully prepared to proceed to trial in the probate case if no settlement had been reached.  The probate court noted several times that the parties had engaged in extensive discovery, and the docket sheet reflects that

depositions transcripts had been filed and trial subpoenas had been issued.  Clients'
experts do not identify anything that Dinsmore failed to do to prepare for the trial, other
than suggesting that the Ross Sinclaire conflict hampered their vigorous prosecution of
Clients' claims, or that they did not prepare witnesses during the days preceding
December 5.  The Court concludes that Clients' assertions and allegations with respect
to the issues of a claim against Ross Sinclaire or of Dinsmore's failure to adequately
prepare for trial do not identify a genuine factual dispute that bars entry of summary
judgment on these issues.

  For these reasons, the Court grants Dinsmore's motion for summary judgment.

<u>Clients' Motion for Partial Summary Judgment on Dinsmore's Claims</u>

  Clients seek entry of partial summary judgment with respect to Dinsmore's
complaint.  (Doc. 67) Clients argue that there is no genuine dispute that Dinsmore's
fees are excessive and unrecoverable.  After reciting their allegations about Frank
Stark, his alleged undue influence and self-dealing, they argue that Dinsmore's conflict
of interest precluded their zealous and effective representation of Clients.  They rely on
the opinion of Lawrence Fox that Dinsmore's conflict of interest and resulting breaches
of duty voided the contingent fee agreement as a matter of law.  They also rely on the
opinions of Jonathan Coughlan and Geoffrey Stern, that Ronda Stark would have
inherited approximately $445,000 under Charlotte Stark's 2011 will, even if no litigation
had ever been filed.  Dinsmore's claim to recover contingent fees on this amount is
therefore unethical and improper.  They also opine that Dinsmore cannot rebut a
presumption that the modification of its fee arrangement with Clients (from hourly to
contingent) was fraudulent and unenforceable.  Clients further argue that Dinsmore's

claim to recover fees for time spent to collect its contingent fees is untenable.

Dinsmore responds that there are numerous genuine factual disputes about all of these issues that preclude granting Clients' motion.  (Doc. 73) Dinsmore notes that Clients' motion does not address the factors set forth in Rule 1.5(a) of the Ohio Rules of Professional Conduct for assessing the reasonableness of an attorney's fee.  Those factors are:

> (1) the time and labor required, the novelty and difficulty of the questions involved, and the skills requisite to perform the legal service properly;
>
> (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;
>
> (3) the fee customarily charged in the locality for similar legal services;
>
> (4) the amount involved and the results obtained;
>
> (5) the time limitations imposed by the client or by the circumstances;
>
> (6) the nature and length of the professional relationship with the client;
>
> (7) the experience, reputation and ability of the lawyer or lawyers performing the services;
>
> (8) whether the fee is fixed or contingent.

Dinsmore also recites the multiple factual disputes regarding the assertions and conclusions on which Clients' experts purport to rely in opining that Dinsmore's fee agreement is unreasonable as a matter of law.  Dinsmore and its own expert disagree about the alleged conflict of interest with Ross Sinclaire; disagree that Dinsmore ever "agreed" to cap its fees at $160,000; disagree that Ms. Stark stood to inherit anything under Charlotte Stark's 2011 will; disagree that the contingency fee agreement was "forced" on Ms. Stark; and disagree as to the legal basis for Dinsmore's claim to recover

fees and costs of defending against Clients' counterclaim.  In their reply memorandum,
Clients repeat their factual allegations concerning the circumstances of the original
retention and the subsequent discussions about hourly vs. fee cap vs. contingent
arrangement.  They contend that Ms. Stark's testimony, combined with the later
conversations about Ross Sinclaire, entitle them to a judgment as a matter of law that
Dinsmore's fee contract is unenforceable.

The Court disagrees with Clients' contentions.  Contrary to Clients' arguments,
the Court concludes that there are genuine disputes between Clients and the Dinsmore
attorneys about the discussions among them, and the factual circumstances that led to
the execution of the April 2013 fee agreement.  Clients present persuasive arguments
on many issues, but Dinsmore's expert presents an alternative argument that depends
upon the jury's resolution of disputed facts.  In view of these disputes, the Court cannot
grant Clients' motion for partial summary judgment on Dinsmore's fee complaint.

## CONCLUSION

For all of the foregoing reasons, the Court grants Dinsmore's motion for summary
judgment (Doc. 62) and denies Clients' motion for partial summary judgment (Doc. 67).

SO ORDERED.

DATED: April 4, 2016                              s/Sandra S. Beckwith
                                                 Sandra S. Beckwith, Senior Judge
                                                 United States District Court